Thank you. May it please the court. I'm Kathleen Caldwell. My opponent today is Marcia McShane Watson. I'm here on behalf of Ruby Blackmon, who had represented herself for the preponderance of the discovery phase without counsel. We came in, myself and my co-counsel, came in at the point that the magistrate judge had entered a report and recommendation. I think there are two essential issues that we bring to this court, both of which require that the summary judgment be reversed and the matter remanded to the court. The first one I would like to address is a matter of first impression, we believe, and we've spent a considerable amount of time trying to research it very thoroughly. We contend that there is an inherent conflict of interest when a magistrate judge acts as a mediator and then acts as a decision maker. The action of the district court below adopted the report and recommendation of the magistrate judge, and the district court, his decision itself is improper and therefore tainted if the magistrate judge's is tainted. Just to be clear, this was not a magistrate judge trial. There wasn't a waiver to the magistrate. That is entirely correct. It was a report and recommendation which, at least under the law, the district judge is supposed to consider de novo, right? And he said he did, and he said that he had several choices. One was to adopt it, another one was to reject it, but he went on to adopt it. And by then, before he reached that ruling, we had brought up the issue of impartiality and the propriety of the magistrate judge acting in both roles. We are not here to throw stones at Judge Fahm, Judge Fahm the magistrate judge. This is not a matter of a judge doing a bad thing or a wrong thing. We are not throwing stones at the district court. We hold that district judge in high esteem. But… Well, you are saying that they did something wrong in the sense of not assigning a different magistrate judge to do the R&R. Absolutely. And here's the twist. Sorry if I could break in. Do you have any sort of knowledge? Is this a practice that is followed on more than one occasion, either by this district judge or by the district court in Memphis generally? In Memphis, when you file a complaint, sir, you are initially assigned a magistrate judge to your file. You don't know who the judge is. And then if you reject having a trial before the magistrate judge, you then are assigned the district court. At least that's how it worked for the last perhaps five years. I'm referring to having a mediation, and certainly magistrate judges doing mediation is very common across the whole country. It's the fact that then they don't take it away from that magistrate judge to do an R&R. I was just asking sort of for practice from Memphis. Have you seen this happen in other cases? I have. I have seen it. It has not happened in one of my cases because I'm outspoken and I would not let it happen. I'll be very blunt. It's not going to happen. Well, it had happened here. That is, you can complain, but the judge can go ahead and do it. The magistrate judge acted as the mediator. Yes, sir. Before he got the case for an R&R. Yes, sir. And then later he was assigned to write an R&R. That's correct. Was there an objection at that point to his doing it? No, and there was not a mechanism at that point. It was not anything that the plaintiff would have known what to do. The plaintiff received an order saying it's being referred. It was a done deal. But he could move to ask to vacate that order. Yes, sir. I'm not denying that. She could protest. Did she? No, sir. She did not. It's only after she got an unfavorable recommendation that she then interposed the objection to the fact that the district judge was relying on an R&R from a magistrate judge who had previously acted as a mediator. I think that's a fair statement, Judge. I'm not going to say otherwise. I would say this. When we intervened or when we put in our appearance and we filed objections to the magistrate judge's report and recommendation, there was an ample opportunity right there for the district court to have either asked the magistrate judge to look to see whether he had acquired any personal knowledge or he could have at that point appointed a different magistrate judge. When you got into it, did you then object? Yes, sir. Immediately. To the fact that you'd done it? We did it immediately. First thing we did. The objections... In other words, all this was pro se until you got into it. That's exactly right. So she really can't be faulted? No, sir. In fact, as I'll say on the next issue, she did an outstanding job for a person of her background and lack of education. She was very forthright and active as a pro se plaintiff. But we made an immediate objection, Your Honor, and it is contained as the first issue in the objections to the report and recommendation. I'm going to conclude to an extent right there because I have so little time remaining. I think I only have three minutes, 47 seconds. Does that include my five minutes? If you asked for the five minutes, then they did. Is that right? Yes. So I have three minutes to talk? Plus five minutes for a couple, or you can use more of that time if you want. I have supported our argument about the magistrate judge with reference to the various statutes that I think are of key significance. The second issue that requires reversal. Magistrate Judge Fahm reached a decision in which he weighed the evidence. He compares affidavits of this person versus affidavits of that person. He makes credibility determinations. That alone should be sufficient to reverse the magistrate judge. The district judge rubber stamped it, and that needs to be reversed. Are you saying he made the credibility determinations based on affidavits and not testimony, not having an opportunity to observe the witness? That's exactly right. Okay. That's exactly right. And who were the affidavits that he relied? Were these critical witnesses? They were critical witnesses. We have Angela Scott as a critical witness. We have, just a minute. Scott, the other woman in the altercation? Yes, she is another woman who also complained. We had about someone watch, Daryl Titlow watching someone's breast. You have Ms. Blackman, Ms. Scott. You have Stephanie Jones. You have Mr. Polk. All of these. Going to some of the facts here, some of this starts when Polk was trying to get her to sign a final warning. What was that final warning about? I was trying to find that in the record. It's really not clear what it is because he tore it up and said it wasn't going to be against her, would not be used. And then her second-line supervisor, Mr. Titlow, says, well, I'm going to make sure it's in your record anyway, sign it. And she refused to sign it. And the war was on. I want to jump again, and I don't mean to abuse what we're doing here. We're asking this court to take a new position. We're asking this court here to find that it's not a reasonable person standard on whether the evidence was sufficiently pervasive or severe. We're saying it should be from the viewpoint of a reasonable woman. And some courts have been finding that. If you look at our reply brief, we've cited to those courts. Why is that? Was there any indication that the district judge's and the magistrate judge's findings rested on that distinction? I think it did, Your Honor, because he said he didn't see why looking at a woman's breasts would be that big a deal. Now, that was, as I understand his ruling, Your Honors, only a woman who wears breasts, who has breasts, can know what it's like to have herself stared at day in and day out. Ruby Blackman's standard needed to be a reasonable woman standard. We have provided some case law and some law reviews that support that position, and it's time for some change in the law here. And we think the Sixth Circuit could do this. Well, actually, Judge Keith employed that reasonable woman standard in a case, I believe, back in the 1980s. I don't have the name of the case here, but apparently that may already be some law in the circuit on that. I have not found that. I apologize. Yeah, I'll see if I can find that. Okay. I would love to keep discussing, but I think I'm out of time. Go ahead. Let me bring up one last thing. I know you're out of time here, but in your brief, you start talking about pretext, and you don't say much about causation. That's a separate issue. Are we supposed to assume that there is causation here because of your presentation of the facts? You don't spend a lot of time arguing that, that you've satisfied the causation requirement as a sort of separate issue. You kind of skip the pretext to some extent. What would you say about that? I think it was all tied up in part and parcel with the allegation that the plaintiff had used the N-word, and when she adamantly denied she'd ever done so except in the context of a conversation with HR personnel about the use of the N-word, and they asked her about it, and she used the N-word within that context, not openly out with other people. And she said that she was being treated this way on account of her complaints, and I think the record is replete with efforts to go to different supervisors both internally and then on the corporate level because of the sex harassment. I know we're out of time. Just one more question if Judge Boggs would bear with me. Your client worked there a long time and apparently without problems. That's right. And toward the end of her employment, she was accused of using inappropriate language. Now, is this something that she allegedly started using just shortly before the termination, or is this the kind of language she purportedly used throughout? I mean, was there some change here, or they're only alleging she used that around the time of her termination? Well, I can't say what's in the mind of the defendant, Your Honor. I can say this. She'd never had a complaint before. Now, I'm just asking you what are they alleging in that regard? Well, it's less than clear to me, but we did produce a witness who testified he or she had never heard her use the N-word before. And which way does that cut? Because I think the question about causal connection is that on a retaliation claim, you can't just claim that this was a bad HR decision, and usually you start out with she does something and a day later or a week later they fire her. This is, what, seven and a half months or seven months, something like that. But it was continuous. What's the it? Her complaining was continuous? Yes, her complaining was continuous. She kept going to various persons trying to get help to get her out of the predicament in the environment. You will hear the defendant more likely than not say that there was a period of several months with no activity. I think our brief shows that that's not true, that she had been making complaints. What's your best claim of something of that sort, let's say, within a month or two months? Within six weeks. And I would say she was saying that the harassment was two to three to four times a week. No, but the harassment is not the issue. It would be the complaining that's the issue. And then she would go to supervisors and she would call the person at corporate and would get no response. Is that specific? I don't have it in my head. I'm so sorry. But you think there is a place where you'd say, you know, on such and such a day or week or month I did something? I do, and I don't think I responded well. We'll look for it. I don't think I responded well to Judge Clay. We dealt with pretext more than causation because that's what was the focus of the district court and the magistrate judge in terms of what needed to be in the record. I appreciate the court and your indulgence in giving me a little extra time. Thank you, counsel. You'll have your time for rebuttal. Marcia McShane here for Eaton. The summary judgment that was granted by the district court should be affirmed for several reasons. First of all, the plaintiff failed to establish any genuine issues and material facts as to her prima facie case of sexual harassment. Let's go back first. Sure. This case is filed. Yes, sir. She's representing herself. Correct. The case goes to a magistrate judge to see if it can be settled. That's right, by a joint motion. Right? Yes. And it doesn't get settled? No, it does not. You know whether it didn't get settled because the defendant made an offer that the plaintiff rejected or the defendant said to the magistrate judge, we're not going to settle? I do know. What? They did negotiate very briefly. They negotiated? Yes. And you don't know which of the two didn't agree to the settlement? Well, I guess neither of them agreed because they put all the papers in their head. In any event, the magistrate judge's efforts to settle were rejected. That's a fair statement. Right? Correct. So he now is going to decide the summary judgment after he failed to get a case settled. That's true. So in failing to get a case settled, it's not a black mark on his record. No. But at least he would be disappointed that his efforts weren't fulfilled. Well, there's nothing in the record to suggest that. Well, that's human nature, isn't it? Sure, sure. I'm a district judge in my other life, and I try to get parties to settle. Right. Now, I try it in an environment in which my judicial efforts have failed. Do you think that's right? Well, I think the difference in this particular case is that he did not try the case. He only issued a report. He didn't try it. It's his report and recommendation. Right, which was reviewed de novo by the district court judge as to any objection that Ms. Blackman wanted to make. And each of those objections were considered de novo by the district court. And after doing so, he got... But this magistrate judge made some strong findings. He did. That Ms. Blackman failed to prove the allegations that she was making. Absolutely. Do you think that this case gives the appearance of fairness? I do. To a third party? I do. To a pro se litigant? Well, obviously not Ms. Blackman. She discovers that after she was in front of a magistrate judge and didn't settle, now she finds the magistrate judge made a report and recommendation against her. Well, I think the problem that I have with Ms. Blackman raising an objection to the magistrate is that, first of all, the timeliness of it, and then second of all, the de novo review by the district court judge, and then third, the case law that we have that provides us guidance on this issue. I do not believe this is one of first impression in the Sixth Circuit. The delay in the objection was because she didn't have a lawyer. Well, I don't agree with that, with all due respect, because she moved for extensions, filed numerous pleadings, and did an awful good job. If you look at the pleadings in this case before Ms. Blackman had a lawyer, she was not shy about asking for an extension. She asked for an extension to file her response to summary judgment, which was granted. In that request, she asked, without a lawyer, for more time so that she could get the affidavits that she needed to respond to summary judgment. She responded to summary judgment, still didn't provide the affidavits that she only provided after her time was up and the report and recommendation came down. It was only then that she came up with this new evidence where she was alleging constant harassment by Mr. Tetlow and additional declarations from witnesses that were due back when the summary judgment response was due. She never alleged that they were not available at the time of the due date, and as the district court pointed out on page 9 of its opinion, that a plaintiff who is pro se when she responded to a motion for summary judgment does not change the court's analysis. The Supreme Court has instructed courts to hold pleadings filed by pro se litigants to a less stringent standard than those filed by lawyers, but has never suggested procedural rules and ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel. And in this particular case, not only did Ms. Blackman, when responding to the statements of undisputed fact, fail to cite to anything in the record at all, even though she failed to do that, which should mean all of those facts are not in dispute for purposes of summary judgment, she filed an affidavit, and what did the court do? They gave her the benefit of the doubt because of that, because she was a pro se, gave her the additional time, and in doing so they deemed any facts that she disputed in her affidavit in dispute. The problem is the disputed facts that Ms. Blackman alleges are not material to this cause of action, and let me tell you why. She disputes things like whether she used the racial slur in the workplace. Of course, in the Sixth Circuit, it does not matter whether ultimately what is believed by the person who makes the termination decision was true, it actually happened. What matters is whether they had an honest belief at the time and a reasonable basis for that belief when making the termination decision. However, there could be an issue of fact as to whether the invocation of the honest belief is honestly done or whether it's done protectively. There can be a disputed issue of whether the material fact as to whether the honest belief rule is being properly invoked or is being done for improper purposes or purposes of subterfuge. So I don't know that just saying that really helps our understanding all that much. And I think that's fair, but what we have in this situation, which is discussed on page 33 of the report and recommendation, is the facts that Ms. Blackman does not dispute that support the defense of the honest belief rule. For example, she does not present any evidence to infer pretext at all. She also does not dispute that she engaged in an altercation on the floor with Stephanie Jones, the employee that accused her of using the racial slur. You say that she doesn't say anything about pretext. She's claiming retaliation, which, I mean, there's all kinds of pretextual presumptions in her contention that this is retaliatory. Right, and she does definitely claim pretext. What we don't have is any evidence to support that claim. She states it's pretext because seven and a half months later she was terminated. The evidence you have is her own statement that she didn't use the language. I mean, your client and the opposing party have entirely different versions of the facts here. The parties don't agree on what the facts are. That's why we have finders of fact to look at this stuff. Well, I think the facts that we do agree upon are all that we need to affirm the summary judgment of the district court. Specifically with regard to the pretext issue that you brought up, when the plaintiff in this particular case, Ms. Blackman, does not dispute that she engaged in an altercation. Now, she may dispute what exactly happened in that altercation, but she does not dispute that one happened on the floor. Moreover, she does not dispute that Jones, her co-worker, accused her of using the racial slur. That is not in dispute. She also does not dispute that the incident between she and Jones resulted in a meeting with Ms. Blackman, with Ms. Jones, with Ms. Florence, and Mr. Polk, all in the HR office. She further does not dispute saying the N-word in the meeting when they were talking about it. So her recitation of that is that she was simply saying, I didn't do it. That's what she claims. I mean, there's other views on the other side, but at this point, if she says that that's all that happened, and the decision makers are the people who were there, this isn't a case, or correct me, this isn't a case where somebody writes up a report and it goes to a higher-up and the higher-up doesn't know anything. That's not correct. Ms. Florence and Mr. Polk were the ones that were in the office having the discussion about the altercation when the use of the racial slur was used, however it was used. At that point in time, Ms. Hood, Kimberly Hood, was out of the office, away from the facility. She was the decision maker. So what happened is, after the meeting, Ms. Florence and Mr. Polk reported to Ms. Hood their findings of the investigation related to the incident and their belief, based on that investigation, that Ms. Blackman violated the harassment-free workplace policy by using a racial slur repeatedly in the workplace. Okay, so their finding was not that it just happened in the office. It was repeatedly during the altercation. Well, no, that's not correct. The finding that they made was that she used it on the warehouse floor, according to Stephanie Jones, and that while they were meeting with her, talking to her about it, that she used it so frequently that they had to repeatedly ask her to stop. Okay, so that's their direct statement of their reasons. Correct, and their declarations were submitted at the summary judgment phase and are available in the record. And then Hood makes the decision. That's correct. And Hood not only made the decision, but had to send the recommendation up the chain for just a review, and they agreed with her decision and affirmed it based upon a review of the information gained through the investigation of the incident. Okay, with respect to the causation that I was taking up with your colleague, at pages 9 and 10 of her brief, she does recite a series of statements about things that happened after this beginning of the seven months. For example, in early September, Blackmun State, she approached Hood and asked why she hadn't heard anything and then was called into Tetlow's office and threatened her job and that sort of thing. Why aren't those sufficient complaints to at least bring the causation issue to a much narrower time frame? Did you say page 7? 9 and 10. Okay, the problem that I have with all of the citations on page 9, 10, and prior to that, for the most part, you'll notice that they relate to a declaration of Ruby Blackmun at record 58. That is the declaration that Ms. Blackmun submitted with information never heard before in objection to the report and recommendation. She was deposed. Is this post-deposition? Post-deposition, absolutely. So new information that did not come out in the deposition, and if you all will look at the deposition, Mr. Doyle, my colleague, repeatedly asked her if there's anything else. Have you told me about anything else? How many times did this happen? And the only information she could give is that a couple of times he touched her back and a couple of times he breathed on her. Let's stop. You're going into the harassment and the hostile work environment itself. I'm talking about the timeline on the retaliation. Right. Again, she's claiming that these things occurred after she reported the alleged harassment in February. Of course, her termination was not until seven and a half months later in September. The problem is that this information, that there were any specific instances like talking to Ms. Hood or any of the information that she's got in here in this declaration that was filed after the report and recommendation was all information that did not exist until that late filed declaration. So that would go under the legal principle about not contradicting your deposition, post-deposition. Well, that and it being untimely and that even pro se litigants are not excused from untimely evidence, especially after they had already been given an extension by the court. Well, but normally in opposition to a motion for summary judgment, you can file affidavits. Absolutely, within the court imposed deadlines. Absolutely. This one was outside that deadline. And was it in some way specifically rejected by the court as saying it's untimely? They did not. In fact, I have a footnote in my brief about the fact that the district judge references some of the information that's in this late filed declaration, but did not specifically reject it, but citing it suggests that he considered it. And even when you consider the information that she provided in the late filed exhibit, there is not, unless I'm overlooking something, any example. I guess the only thing she says that's close to her termination date is she claims in September 2010 that she approached Ms. Hood and asked why she had not heard anything. That's what I was quoting. Right. Of course, the problem with that is because it was not timely, because it was filed after not only the deadline for her to provide her response, but even beyond the extension that she was granted by the trial court, Eaton does not have an opportunity to refute that with any type of additional evidence. We don't get to take her deposition on these new allegations. And at a minimum, Judge, you're right. It is inconsistent with her prior deposition testimony. She does also, at the bottom of 9th, talk about things in May and June, which are in between that narrows the time period. Let me ask you one other thing, then, because we haven't really talked about the substantive hostile work environment. Sure. It seems usually in these kind of cases you have physical touchings, talking, and in this case, staring. Right. Here you do have at least one allegation of physical touching, back rubbing, breathing. You do have, I guess Mr. Polk says something about he liked breasts, but is that the only verbal that's alleged? That, too, was a new piece of information that came out after Mr. Polk's deliberations. Is that also from 58-1? I believe it is. But, you know, she says that she changed her dress, she was looking over her shoulder. Why isn't that severe and pervasive? Well, because she doesn't allege at any time that any of the things that she claims Mr. Tetlow did were sexual in nature. She claims that he touched her back and that he breathed on her. She claims he was staring at her, but let's remember Ms. Blackman had been written up twice prior to this for hiding and concealing her cell phone. Why isn't that a factual matter in the sense that, correct me if I'm wrong, I didn't see Tetlow testify or depose that that was the reason he was staring at her breasts. The information from that came from Ms. Hood, who conducted the investigation of the sexual harassment allegation that Ms. Blackman made. Additionally, there's... Sorry, did she say that Tetlow said that, though, or I thought this was... You know, we know that there's these allegations about the cell phone. Sure. And we know, at least there's a statement that, in fact, when she was run out of the building, she pulled it out. But I'm saying is that inference or is that connected to Tetlow saying, sure, I was staring at her breasts, that's why. He denied looking at her chest. However, Ms. Hood... But if he denies, that's why... If he denies looking at it, how can it be excused on the grounds that he was looking for the cell phone? Guys, I'm saying you and the light and the most favorable to Ms. Blackman, even if what she says is true, it's not severe and pervasive. Based upon her evidence that she put forward, it was not a situation that it was happening frequently. She said he breathed on her neck two to four times. She, in her late filed exhibit, said he was constantly staring at her. In her deposition when asked, she said she couldn't remember exactly how many times. She claimed it made her uncomfortable and she changed the way that she dressed and looked around. But when you look at the numerous cases cited in the report and recommendation as well as by the district court and that you all are familiar with, starting on page 15 of the report and recommendation, this does not amount to anything close to the Sixth Circuit's high standard for severe and pervasive. Because while we may not like what Tetlow did, if it actually happened, and we may not think that it was nice of him to do that, that does not mean that it rises to the level. I think from your brief, what's the best case that you say gives a high standard? Is that Shawnee State case? The two that I saw were Shawnee State and Black v. Zaring Homes. Is that the best cases from your point of view? I think so. I mean, there are lots of them I'm looking at here. Counsel, I've read those. Anything else, judges? All right. Thank you very much. Ms. Caldwell, you have your five minutes for rebuttal. Thank you, Your Honor. Your Honor, I want to be brief. First of all, the allegation that there's inconsistencies between Ms. Blackman's two affidavits needs to be pointed out. The first affidavit, she supplied in her response to motion for summary judgment. She drafted it herself. Then it is consistent. At the time of that, was she still pro se? Still pro se. She was pro se at her deposition. There is not a material inconsistency between that affidavit and her deposition testimony. Then when we got into the matter, we prepared an affidavit and went with her very carefully through both her prior affidavit and her deposition testimony. The affidavit she produced with our help is, again, consistent. It amplifies. It tells more, but it doesn't say anything that is contradicted. When you say it tells more, I mean, you're familiar with the case that says that you can't contradict. If somebody says, you know, I don't have anything more, I can't remember, and then they remember later on, isn't that inconsistent? No, sir, not in the context of the question, how many times did he do it? And she says, well, I'm really not sure. I've got to think about it. This is a very illiterate person. I mean, I don't mean to cast aspersions on Ms. Blackman, but she is a shipping clerk who has struggled to do just as well as anyone can do. She's done well, but she's not literate. She's not college educated. You say she's not literate. She filed a number of pleadings in English. They're literate to that extent. She certainly didn't. You may say she's not learned it, but the word literate has a meaning, right? Well, I agree with you, but she certainly did not know terms of art. She did not know an awful lot about the law that she needed to know. The requirements of what's severe or pervasive, for example, she did not know that. To the extent that we're talking about contradiction with a deposition, she's just a witness. She's just a witness. No better, no worse than any other witness. And she didn't really contradict herself. If you read it in context, and we've provided all of that to you in the record, it is abundantly clear, especially on page 10 of our brief, that there was a very active period on page 9 in the summer of 2010, and in September at least three different episodes that were significant. One is... Is your adversary right that pages 9 and 10 pretty much comes from record 58-1? It does. We've cited to it. And that was because in their motion they said nothing had happened during the summer for months. You know, there was a gap, and we cleaned up the gap. But it's all very clear, and it's, again, consistent with the proof. It shows about the episode when she's called into Tetlow's office, and he makes accusations, and he threatens her to send her home. And then she ends up at the end of the month getting terminated. I think one of the questions I had before was how close in time was all of that. Well, that's a matter of maybe two weeks maximum. I'm sorry. Were you reading or were you stating something? I'm stating something. Is that from... Well, it says in early September there was when she approached Ms. Hood. You're reading the same thing from page 9? Page 10. That's fine. Just the way you said it, I thought maybe she had said there was two weeks. No. She said later that month she goes into Tetlow's office, and then finally at the end of that same month she was terminated. That's three events within one month. So there is a real short period of time there. You ask opposing counsel what happened in the mediation. I was not there. Ms. Blackman could have answered those questions. There's no record created. If the district court had asked for some sort of report or position paper or whatever, a show cause, all of that could have been done. Of course, it could have been done the other way if you thought that there was something that happened at the mediation that would really have prejudiced him. If, for example, the magistrate was beating on her to settle and she didn't. To be perfectly blunt, Your Honor, we chose not to explore all of that because the magistrate judge can't defend himself. That's perfectly fine. And it just seemed ethically better to take that off. I'm not faulting you on it. I'm just saying I wouldn't fault either way. The other side would have the same problem potentially. Absolutely. For all of these reasons, we ask for this matter to be remanded. Thank you, counsel. The case will be submitted, and the clerk may call the next case.